Filed 8/5/26  P. v. Rodriguez CA2/4

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(a). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115(a).

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>CHRISTOPHER RODRIGUEZ JR.,<br><br>    Defendant and Appellant. | B348960<br><br>Los Angeles County<br>Super. Ct. Nos.<br>24WCCF00079,<br>23WCCF00155 |

APPEAL from an order of the Superior Court of Los Angeles County, Joan M. Chrostek, Judge.  Vacated and remanded with directions.

Travis Daily, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Scott A Taryle and Kenneth C. Byrne, Deputy Attorneys General, for Plaintiff and Respondent.

Christopher Rodriguez, Jr. was convicted of robbery and inflicting corporal injury on his girlfriend. He appeals the trial court's order denying his motion for mental health diversion. We reverse.

Rodriguez is a young man with mental health problems. Those problems were a significant causal factor in his underlying criminal behavior which occurred when he was off his medication. At the time of his diversion hearing, however, he had consistently complied with his medication regimen for about a year and half. During that time, he did not engage in any criminal behavior.

After the trial court denied Rodrigeuz diversion, Rodriguez pleaded no contest to the crimes he was charged with, and the trial court placed him on formal probation for three years. On appeal, Rodriguez contends the trial court's finding that he was unsuitable for diversion is unsupported by substantial evidence. We agree.

We direct the trial court to vacate the order denying Rodriguez's motion for mental health diversion and to enter a new order granting the motion unless there is evidence of changed circumstances that provide a basis for denying the motion consistent with this opinion. If the court finds changed circumstances, it shall hold a further hearing on Rodriguez's motion for mental health diversion.

## PROCEDURAL BACKGROUND

In June 2024, the Los Angeles County District Attorney filed two informations against Rodriguez in separate cases. One information, in case number 23WCCF00155, charged Rodriguez

with willfully injuring his girlfriend.  (Pen. Code,[1] § 273.5, subd. (a).)  The other information, in case number 24WCCF00079, charged Rodriguez with robbery.  (§ 211.)

In September 2024, the defense filed a motion for mental health diversion under section 1001.36, which the prosecution opposed.

On May 9,  2025, after hearing witness testimony and argument, the trial court denied Rodriguez's diversion motion.  A week later, the defense filed a motion for reconsideration of mental health diversion, which the trial court also denied.

On September 2, 2025, Rodriguez pleaded no contest in both cases.  In the case involving Rodriguez injuring his girlfriend, the court suspended execution of sentence and granted him three years formal probation.  In the robbery case, the court sentenced Rodriguez to serve 28 days in county jail, then awarded him that same amount of credit for time served.  Rodriguez timely appealed in both cases.

## FACTUAL BACKGROUND

Rodriguez was charged with committing two crimes on or around December 8, 2023.  At the time, he was 18 years old and he had no prior criminal history.

**Robbery**

We summarize the facts concerning Rodriguez's robbery from the testimony of the victim at the preliminary hearing.

Just after midnight on December 8, 2023, Dominic Nava, an Uber Eats driver, was making a delivery in Rowland Heights.  After making the delivery, Nava walked back to his car where his

---

[1]     Subsequent unspecified statutory references are to the Penal Code.

girlfriend was waiting.  When Nava arrived at his car, Rodriguez was standing by the driver's side window.  Rodriguez asked Nava for a ride and Nava refused.  Rodriguez kept insisting on Nava giving him a ride as he blocked Nava from entering the car.  Rodriguez motioned toward his waistband in a way that made Nava concerned he may have been gesturing toward a weapon.  Nava was worried because he did not know whether Rodriguez had a weapon.  Rodriguez told Nava he was going to steal his car.  Rodriguez snatched Nava's phone out of his hand.  Then, using his own phone, Rodriguez took a picture of Nava's license plate.  Rodriguez threatened Nava that he could find information about Nava's girlfriend using the license plate number if Nava reported the incident to the police.  Rodriguez told Nava he was going to steal Nava's car unless Nava called him an Uber, so Nava complied.  When the Uber arrived, Rodriguez got inside and left with Nava's phone.

**Rodriguez's infliction of corporal injury to his girlfriend**

At the preliminary hearing in June 2024, Mia A. testified about Rodriguez's physical abuse in late evening of December 7 and early hours of December 8, 2023.  Rodriguez committed violence against Mia A. three times that night.  First, in a park, he punched Mia A. in the face and ribs about 10 times.  Next, in the living room at his grandmother's house, he hit Mia A. with a bat on her palms, legs, and back more than 10 times.  Lastly, in a bedroom in his grandmother's house, Rodriguez hit Mia A. with his fist and his phone in the face and ribs more than 10 times.  The police arrived at Rodriguez's grandmother's house in the early morning.

At the mental health diversion hearing in May 2025, Mia A. testified more broadly about Rodriguez's abuse in November

4

and early December 2013, and Rodriguez's struggles with mental health. She testified that she was Rodriguez's girlfriend for six months. During the last months they dated, Rodriguez had a mental health diagnosis and was supposed to be taking medication, but he did not take it consistently.

During the last month they were together, Rodriguez was abusive toward Mia A. Rodriguez slapped her in her face and punched her in her face, ribcage, and throat. She estimated that he slapped and punched her 60 times. He also hit her with a wooden stick, a metal pipe, and a metal bat. She estimated that he hit her with a wooden stick around 20 times and with a bat around 10 times. He hit her with the metal pipe 10 times on one occasion. He also bit her nose and headbutted her about 10 times. On one occasion, after he caused a gash on her finger by hitting her with a pipe, Rodriguez forced Mia A. to put the finger in hot water and salt, "and it was burning so bad that [she] would take it out and he would . . . hit [her]."

The prosecution introduced photographs into evidence depicting Mia A.'s injuries. Those photographs showed that Mia A. sustained large bruises on her arm and leg, as well as lacerations and swelling on her hands. Mia A. was also present when Rodriguez robbed Dominic Nava, and the incident scared her. She suffered severe symptoms related to stress stemming from Rodriguez's abuse.

Mia A. never reported the abuse to law enforcement because Rodriguez told her "that he would hurt [her] family" if she did. He threatened to "leave [her] dead in a ditch" if she "didn't obey him." Rodriguez also threatened to harm her cat.

Mia A. was aware that Rodriguez was seeking mental health diversion. The idea that he might be treated in the

community made her feel uncomfortable and unsafe. He had not contacted her since a stay away order was issued in January 2024, roughly a year and four months before her mental health diversion hearing testimony.

**Evidence concerning Rodriguez's mental health issues and treatment adduced in the trial court**

### A. Synopsis

When Rodriguez committed his crimes, he suffered from a psychotic episode. In the months before, he was not consistently taking his oral medication for his mental health problems. In late December 2023, however, Rodriguez began consistently taking his medication through long-acting injections. Rodriguez remained medication compliant while not committing additional criminal offenses through the date of his diversion hearing in May 2025. There was uncontradicted medical expert testimony that Rodriguez was not at risk of committing a super strike if he remained medication compliant.

### B. Dr. Ruiz's report assessing Rodriguez's eligibility and suitability for mental health diversion

Dr. Ruiz evaluated Rodriguez in July and August 2024, and he submitted a report documenting his assessments of Rodriguez. According to Dr. Ruiz's report, Rodriguez stated that he had experienced visual and auditory hallucinations. Rodriguez began exhibiting symptoms of a mental health disorder when he was 16 years old, but he did not obtain mental health services until his arrest. Rodriguez was 18 years old when he committed the crimes that gave rise to this case. The record reflects that Rodriguez had no criminal history prior to the present case.

Dr. Ruiz reported that Rodriguez meets the criteria for bipolar I disorder with psychotic features. He opined that

6

Rodriguez's mental health disorder was a significant factor in the commission of the charged offenses. According to Dr. Ruiz, Rodriguez "displayed symptoms consistent with the relevant mental disorder such as irritability, emotional instability, negative alteration in cognition, sleep difficulty, delusions of grandeur, auditory hallucinations, using substances to 'self-medicate,' and lack of insight into his mental illness." Dr. Ruiz further opined that Rodriguez's "mental health symptoms and behaviors would benefit from and respond to mental health treatment[,] including medication support[ ] and case management." He stated Rodriguez had expressed that he was motivated to participate in and comply with mental health diversion. Significantly for purposes of the issue presented in this appeal, Dr. Ruiz opined that Rodriguez *did not* pose an unreasonable risk of danger to public safety if treated in the community.

## C. Letters from Dr. Vu documenting Rodriguez's consistent use of medication since his crimes and his positive response to that medication

Dr. Timothy Vu was a board-certified clinician who oversaw Rodriguez's medication treatment. In a letter dated December 27, 2023, weeks after Rodriguez's criminal offenses, Dr. Vu stated that Rodrigeuz had switched from oral medication to long-acting injectable medication to address his previous issues with not taking his medication. In that letter, Dr. Vu reported Rodriguez had shown early signs of marked improvement in his overall symptoms after switching to injectable medication.

In a letter dated January 31, 2024, Dr. Vu stated that since switching to injectable medicine, Rodriguez had demonstrated significant improvement, including reduced delusions, paranoia,

and mood disturbance.  Dr. Ruiz's mental health report subsequently indicated that as of September 10, 2024, Rodriguez remained compliant with his medication and treatment regimens.

### D. Dr. Ruiz's testimony at the diversion hearing that Rodriguez was suitable for diversion if he remained medication compliant

At the May 2025 diversion hearing, following Mia A.'s testimony, the defense called Dr. Ruiz.  Dr. Ruiz evaluated Rodriguez under Evidence Code section 730 and prepared a report concerning Rodriguez after reviewing various relevant documents.  He diagnosed Rodriguez with bipolar I disorder with psychotic features, in contrast with Rodriguez's prior diagnosis of "psychosis with enduring mood disturbance and a presumed diagnosis of schizoaffective disorder" by another clinician.

Based on Mia A.'s testimony, Dr. Ruiz opined that Rodriguez was experiencing a psychotic delusional episode when he attacked her.[2]  Dr. Ruiz also believed Rodriguez was experiencing a manic episode based on Mia A.'s testimony that he had not been sleeping much.  He added that Rodriguez's bipolar disorder could manifest in him threatening and torturing a domestic violence victim.

From a review of Rodriguez's mental health records, Dr. Ruiz observed Rodriguez was receiving injectable medications, which appeared to be working for him.  Dr. Ruiz also noted that Rodriguez was compliant with his treatment at a mental health clinic.  He testified that had Rodriguez been medicated, there

---

[2]     As an example, Dr. Ruiz noted that Rodriguez at one point had a delusion that Mia A.'s fingers smelled like marijuana despite no evidence supporting that belief.

would have been less of a risk that he would have attacked Mia A. Dr. Ruiz did not believe Rodriguez was at risk of committing a super strike if he "stay[ed] treatment compliant." Dr. Ruiz did note on cross-examination that Rodriguez would be at greater risk of committing a super strike if he stopped taking his medication.

## DISCUSSION

**The trial court abused its discretion in finding Rodriguez unsuitable for diversion**

### A. Applicable Law and Standard of Review

Section 1001.36 gives trial courts the discretion to grant pretrial diversion for individuals suffering from certain mental health disorders. (*People v. Frahs* (2020) 9 Cal.5th 618, 626 (*Frahs*).) " 'The primary purposes of the legislation are to keep people with mental disorders from entering and reentering the criminal justice system while protecting public safety, to give counties discretion in developing and implementing diversion across a continuum of care settings, and to provide mental health rehabilitative services.' " (*People v. Doron* (2023) 95 Cal.App.5th 1, 7; see also § 1001.35, subds. (a)–(c).)

Section 1001.36, subdivision (b) provides that a defendant is eligible for pretrial diversion if two criteria are met. First, the defendant has been diagnosed with a mental disorder, such as the one with which defendant was diagnosed, within the last five years by a qualified mental health expert. (§ 1001.36, subd. (b)(1).) Second, the "defendant's mental disorder was a significant factor in the commission of the charged offense." (§ 1001.36, subd. (b)(2).) "If the defendant has been diagnosed with a mental disorder, the court shall find that the defendant's mental disorder was a significant factor in the commission of the

9

offense unless there is clear and convincing evidence that it was not a motivating factor, causal factor, or contributing factor to the defendant's involvement in the alleged offense." (*Ibid.*)

If a defendant meets these eligibility requirements, the defendant is suitable for pretrial diversion if four criteria are satisfied: "(1) In the opinion of a qualified mental health expert, the defendant's symptoms of the mental disorder causing, contributing to, or motivating the criminal behavior would respond to mental health treatment. [¶] (2) The defendant consents to diversion and waives the defendant's right to a speedy trial . . . . [¶] (3) The defendant agrees to comply with treatment as a condition of diversion . . . . [¶] [and] (4) The defendant will not pose an unreasonable risk of danger to public safety, as defined in Section 1170.18, if treated in the community." (§ 1001.36, subd. (c)(1)–(4).)

It is undisputed that the first three criteria are satisfied in this case; only the fourth criterion is at issue. The proper inquiry for determining whether the fourth criterion is satisfied is whether there is an unreasonable risk the defendant will commit a super strike if treated in the community. (§§ 1001.36, subd. (c)(4); 1170.18, subd. (c).) Super strikes include sexually violent offenses, child molestation, homicide, attempted homicide, solicitation to commit murder, assault with a machine gun on a peace officer or fire fighter, possession of a weapon of mass destruction, or a violent felony punishable by life imprisonment or death. (See § 667, subd. (e)(2)(C)(iv).)

Section 1001.36 provides the trial court with discretion to deny mental health diversion even if it finds a defendant meets the statutory eligibility and suitability criteria. (*People v. Cabalar* (2025) 117 Cal.App.5th 41, 53 (*Cabalar*).) Such

10

discretion is commonly referred to as a court's residual discretion. (*Ibid.*) "Where the court chooses to exercise this residual discretion to deny diversion, its statement of reasons should reflect consideration of the underlying purposes of the statute and explain why diversion would not meet those goals." (*Sarmiento v. Superior Court* (2024) 98 Cal.App.5th 882, 893 (*Sarmiento*).)

We review a trial court's ruling on a petition for pretrial mental health diversion for abuse of discretion. (*People v. Whitmill* (2022) 86 Cal.App.5th 1138, 1147.) "A court abuses its discretion when it makes an arbitrary or capricious decision by applying the wrong legal standard [citations], or bases its decision on express or implied factual findings that are not supported by substantial evidence [citation]." (*People v. Moine* (2021) 62 Cal.App.5th 440, 449 (*Moine*).)

**B. Trial Court's Ruling**

At the diversion hearing, defense counsel asserted diversion was appropriate. She pointed to Dr. Ruiz's opinion that "mental health [was] a contributing factor" in the domestic violence, as evidenced by only a one-month period of violence while Rodriguez was not taking his medication during a six-month relationship. Counsel also mentioned that Rodriguez had familial support, and his family would help him remain medication compliant.

The prosecutor argued the evidence showed there was "a risk" Rodriguez would commit a super strike if granted mental health diversion. He stressed the troubling nature of Rodriguez's physical and verbal abuse, along with his controlling behavior toward the victim, as well as his history of failing to remain medication compliant.

11

The trial court agreed with the prosecution that Rodriguez was unsuitable for diversion because Rodriguez was "at risk for [committing] a super strike." The court provided no analysis other than stating that it reviewed the motion, expert medical testimony, Rodriguez's "prior history," and "the underlying facts of the case."

## C. Analysis

The trial court did not make the finding necessary to deny Rodriguez diversion. It found that there was a "risk" he would commit a super strike if released into the community on diversion. The court, however, was required to find that there was "an *unreasonable* risk" of Rodriguez committing a super strike such as murder. (See § 1001.36, subd. (c)(4), italics added.) Assuming the trial court applied the correct standard, the trial court's finding that Rodriguez is unsuitable for mental health diversion is unsupported by substantial evidence.

We agree with the Attorney General that the trial court was entitled to consider the "seriousness" of Rodriguez's offenses and we recognize Rodriguez acted in a brutal manner towards Mia A. But Rodriguez did not commit a super strike. Further, at the time he committed his crimes, he had no prior criminal history, and he was only 18 years old. Rodriguez was not a hardened career criminal with a history of reverting back to crime after being released from prison. He was a teenager with a serious mental health problem who was on the verge of his first conviction. He was the kind of person the Legislature had in mind when it enacted the current statutory scheme on mental health diversion.

Moreover, after Rodriguez committed crimes in December 2023, he immediately began consistently taking his medication,

12

which effectively treated the symptoms of his mental health disorder that led to his dangerous conduct. The relevant inquiry is not whether Rodriguez was a danger to society when he committed his crimes in 2023. The relevant inquiry is whether he posed an unreasonable risk of committing a super strike at the time of the mental health diversion hearing in May 2025. By that time, Rodriguez had demonstrated for over a year and a half that he was able to remain medication compliant, and that when he took his medication, he was not dangerous to society.

For these reasons, and because the uncontradicted expert evidence likewise indicates that Rodriguez is *not* dangerous when he takes his medication, we see no substantial evidence supporting the trial court's finding that Rodriguez was unsuitable for diversion.[3] (See *Siam v. Superior Court* (2026) 118 Cal.App.5th 67, 84, 87 [holding no substantial evidence supported denying diversion even though there were two instances of defendant declining treatment and the offense took place while defendant was being treated pursuant to diversion].) We

---

[3] Rodriguez argues the trial court's "subsequent decision to grant probation with conditions substantially similar to those proposed for diversion—including intensive mental health treatment, batterer's program completion, and strict supervision—demonstrates the arbitrary and contradictory nature of its public safety finding." We also note that the trial court released Rodriguez on his own recognizance in the months following the crimes and leading up to the diversion hearing. The Attorney General does not offer any arguments seeking to rebut Rodriguez's contention that it was arbitrary to release him into the community yet find him unsuitable for diversion. Because we resolve this appeal on other grounds, we do not consider the trial court's decision to grant Rodriguez probation.

therefore reverse the trial court's order denying Rodriguez mental health diversion.  (See *Moine, supra,* 62 Cal.App.5th at p. 449 [a trial court abuses its discretion when it denies diversion in a manner unsupported by substantial evidence].)

We reject the Attorney General's argument that the record shows Rodriguez has a "history of not consistently taking psychiatric medication."  Contrary to the Attorney General's assertion, the record indicates Rodriguez had taken his medication consistently since the crimes occurred in December 2023.  And there is only limited and vague evidence in the record of Rodriguez's failure to take prescribed medication before he committed his crimes.  Rodriguez's failure to consistently take his medication prior to committing his crimes in December of 2023 does not constitute substantial evidence that he was unsuitable for mental health diversion in May 2025.  (See *Vaughn v. Superior Court* (2024) 105 Cal.App.5th 124, 136−137 [holding no substantial evidence that defendant was unsuitable for diversion even though defendant had sustained periods of psychotropic medication non-compliance and resisted talking about his mental health].)

We also reject the Attorney General's suggestion that this court should affirm the trial court's ruling as a proper exercise of its residual discretion under the diversion statute.  The trial court never indicated that it was exercising its residual discretion to deny Rodriguez diversion.  Rather, the court denied Rodriguez diversion on suitability grounds in a manner unsupported by substantial evidence.

14

## DISPOSITION

The September 2, 2025 and May 9, 2025 orders are vacated.  We direct the trial court to enter an order granting Rodriguez's motion for mental health diversion unless there is evidence of changed circumstances that provide a basis for denying the motion consistent with this opinion.  If the court finds changed circumstances, it shall hold a further hearing on Rodriguez's motion for mental health diversion consistent with this opinion.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

TAMZARIAN, J.

We concur:

MORI, Acting P. J.

COGLIATI, J.*

---

\* Judge of the Santa Cruz Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

15